**PALAIS ROYAL, INC., Appellant,**

v.

**Frank GUNNELS, Sr.; Jane Gunnels; H.A. Lott, Inc.; Sharpstown Center Associates; Levy Architects Associates, Inc.; and Strange Loop Construction Company, Inc., Appellees.**

No. 01–95–00565–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 30, 1998.

Rehearing Overruled Sept. 2, 1998.

Kathleen W. Beirne, Richard E. Griffin, Houston, for appellant.

Steve Smith, Fred Wahrlich, Geoffrey L. Harrison, Gregory N. Jones, David S. Lynch, Dianne M. Guariglia, William K. Luyties, Houston, Robert L. Wyatt, Corpus Christi, Ronald Dee Wren, Bedford, Craig Shivers, Houston, for appellees.

Before COHEN, O'CONNOR and TAFT, JJ.

## OPINION

COHEN, Justice.

This is a premises-liability case in which the district court, based on the jury's verdict, rendered judgment against appellant Palais Royal, Inc. for $7,387,239.92,[1] plus pre- and postjudgment interest. Palais Royal appeals with 38 points of error. We affirm in part and reverse in part.

---

**1.** The judgment awarded $2,654,789.92 to Frank Gunnels, Sr. in actual damages, $1,132,450.00 to Jane Gunnels in actual damages, and $3,600,- 000.00 to both Frank Gunnels and Jane Gunnels in exemplary damages.

## Facts

This lawsuit arises out of a 1992 accident in which appellant Frank Gunnels, Sr. fell from a stockroom ladder, suffering serious injury resulting in a loss of 25 percent of his brain capacity. Mr. Gunnels was chairman of the board and construction manager of Empire Steel, Inc., a company that was a subcontractor on the 1992 renovation of Sharpstown Center Mall. Empire Steel was hired to install steel support beams in Palais Royal and other stores in the mall.

The stockroom ladder from which Mr. Gunnels fell was installed in 1984 as part of a store remodeling project. Palais Royal hired appellee Levy Architects Associates, Inc. to draw up the construction plans, which were later approved and permitted by the City of Houston. Levy's plans called for a 16–foot tall, permanently attached ladder that would enable a worker to climb from the stockroom floor up over the top of a mechanical mezzanine located in the stockroom. As designed by Levy, the worker would be able to step down onto the mechanical mezzanine floor, where air conditioning units were located. Levy's plans indicated there was to be no "drop" ceiling that would obstruct the worker's view while climbing the ladder.

Palais Royal hired appellee Strange Loop Construction Company, Inc. to do the actual remodeling work. Palais Royal itself acted as the construction architect and supervisor in order to save money. Palais Royal's president and chief executive officer Bernard Fuchs appointed Dean Stocker, a window display decorator with no previous construction experience, as the remodeling manager. Stocker changed the design of the stockroom and ladder and instructed Loop to lower the stockroom's ceiling, shorten the ladder, move the ladder on a different wall, and build a "drop" ceiling. Palais Royal did not ask the City to repermit the altered construction plans. As redesigned, the ladder extended up through the "drop" ceiling and did not extend up over the mechanical mezzanine floor such that a worker would be able to step down onto the floor.

## Charge Error

In point of error A.1, Palais Royal claims the trial court erred in adopting a jury charge that omitted necessary elements of a premises-defect invitee theory of recovery.

Question 1 in the charge asked, "Did the negligence, if, any, of those named below proximately cause the injury in question?" The jury answered "yes" to Palais Royal and "no" to Mr. Gunnels, Levy, Loop, Lott, and Sharpstown Center. This broadform question apparently attempted to allow the jury to find Palais Royal negligent under either an invitee or licensee theory. The instructions and definitions to the charge used the *Pattern Jury Charge* definitions for the terms "invitee" and "licensee." *See* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—MALPRACTICE, PREMISES & PRODUCTS PJC 60.3 ("sole proximate cause"), 65.1A ("ordinary care"), 65.1B ("negligence" of parties other than premises owner), 65.3 ("proximate cause"), 66.5 ("invitee," "licensee") (1997 ed.) [hereinafter PJC]. The charge did not include the *Pattern Jury Charge* definitions for "negligence" of the premises owner, *i.e.*, Palais Royal, (PJC 65.1A) or "ordinary care" of parties other than premises owner, *i.e.*, Gunnels, Levy, Loop, Lott, and Sharpstown Center (PJC 65.1B).

The charge also contained the following instruction, which substantially followed the *Pattern Jury Charge:*

If Frank Gunnels was a "licensee", then, with respect to the condition of the premises, Palais Royal, Inc. was negligent only if:

a. the condition posed an unreasonable risk of harm, and

b. Palais Royal, Inc. had actual knowledge of the danger, and

c. Frank Gunnels did not have actual knowledge of the danger, and

d. Palais Royal, Inc. failed to adequately warn Frank Gunnels, Sr of the condition or make the condition reasonably safe.

*See id.* PJC 66.5. No similar instruction told the jury what it must have found if Mr. Gunnels was an invitee. *See infra* note 3.

■ The elements of a premises-defect invitee theory of recovery are:

(1) a condition of the premises created an unreasonable risk of harm to the invitee;

(2) the owner knew or reasonably should have known of the condition;

(3) the owner failed to exercise ordinary care to protect the invitee from danger; [and]

(4) the owner's failure was a proximate cause of injury to the invitee.

*State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex.1992); *see also Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex.1992); RESTATEMENT (SECOND) OF TORTS § 343 (1965).

■ The elements of a premises-defect licensee theory of recovery are:

(1) a condition of the premises created an unreasonable risk of harm to the licensee;

(2) the owner knew of the condition;

(3) the licensee did not know of the condition;

(4) the owner failed to exercise ordinary care to protect the licensee from danger; [and] [2]

(5) the owner's failure was a proximate cause of injury to the licensee.

*Payne*, 838 S.W.2d at 237 (citing *State v. Tennison*, 509 S.W.2d 560, 562 (Tex.1974)); *see* RESTATEMENT (SECOND) OF TORTS § 342 (1965); PJC 66.5.

■ The charge contained all the required elements of the premises-defect licensee theory of recovery, but Palais Royal argues the charge omitted the first two elements of the premises-defect invitee theory of recovery, *i.e.*, (1) a condition of the premises created an unreasonable risk of harm to the invitee and (2) the owner knew or reasonably should have known of the condition.[3] The charge given required Mr. Gunnels to prove there was an unreasonable risk of harm and that Palais Royal "had actual knowledge of the danger." This benefitted Palais Royal because the charge authorized Mr. Gunnels to recover only as a licensee, which requires a higher burden of proof (actual knowledge rather than constructive knowledge).

We, therefore, overrule point of error A.1.[4] *See* TEX.R. APP. 44.1(a) (standard for reversible error).

In points of error G.1 and H.2, Palais Royal contends the trial court erred in refusing Palais Royal's requested question regarding Mr. Gunnels's status as an invitee or licensee. We do not reach these points, having concluded above that any such error was beneficial to Palais Royal by raising the burden of proof on Mr. Gunnels and requiring him to prove Palais Royal "had actual knowledge" of the danger.

In point of error B.1, Palais Royal argues that Mr. Gunnels waived any possible recovery as a licensee based on the alternate theory that Palais Royal's conduct was willful, wanton, or grossly negligent. *See Payne*, 838 S.W.2d at 237 (describing elements of two theories of recovery for licensee injured by premises defect); PJC 66.7.[5] Pa-

---

2. The owner fails to exercise ordinary care to protect the licensee from danger by both failing to adequately warn the licensee of the condition *and* failing to make that condition reasonably safe. *State v. Williams*, 940 S.W.2d 583, 584 (Tex.1996) (modifying PJC 66.5).

3. The *Pattern Jury Charge* incorporates the first two elements of the premises-defect invitee theory of recovery in the definition of "negligence":
  "Negligence," when used with respect to the conduct of *Dixie Drugstore* as an owner or occupier of a premises, means failure to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition that the owner or occupier knows about *or in the exercise of ordinary care should know about.*
  PJC 65.lA (emphasis added). The charge in this case did not include such a definition. Consequently, the jury was never authorized to find

against Palais Royal because of what Palais Royal should have known. Instead, the jury was authorized to find against Palais Royal only because of what Palais Royal knew.

4. Mr. Gunnels contends that he proved he was an invitee as a matter of law. If this is true, it would only relieve Mr. Gunnels of proving to the jury that he was an invitee as defined by PJC 66.5. It would not change the fact that the charge did not contain all the necessary elements of the premises-defect invitee cause of action. *See supra* note 3.

5. PJC 66.7 states the following:
  Was *Don Davis's* gross negligence, if any, a proximate cause of the [*occurrence*] [*injury*] [*occurrence or injury*] in question?
  *Don Davis* was grossly negligent with respect to the condition of the premises if—

lais Royal correctly points out that Mr. Gunnels has only sought to recover as a licensee based on the following elements: (1) the ladder created an unreasonable risk of harm; (2) Palais Royal knew about the ladder; (3) Mr. Gunnels did not know about the ladder's condition; (4) Palais Royal failed to exercise ordinary care to protect Mr. Gunnels from danger; and (5) Palais Royal's failure was a proximate cause of Mr. Gunnels's injury. This theory of recovery requires Mr. Gunnels to prove both his and Palais Royal's knowledge about the ladder, which the alternate theory of willful, wanton, or grossly negligent conduct does not.[6]

We agree Mr. Gunnels did not seek to recover as a licensee based on the alternate theory that Palais Royal's conduct was willful, wanton, or grossly negligent. Point of error B.1, however, does not attack any action of the trial court. Accordingly, we overrule point of error B.1.

■ In point of error G.2, Palais Royal contends the trial court erred in refusing the following proposed definition:

"Negligence," with respect to H.A. Lott, Inc., means failure to use ordinary care in the exercise of its control over the worksite at the time of the occurrence in question.

The charge submitted to the jury included the following definition:

"Negligence," when used with respect to the conduct of H.A. Lott, Inc., Levy Associates Architects, Inc., Loop Construction Company, Sharpstown Center Associates, and Frank Gunnels, Sr. means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of

a. *the condition* posed an unreasonable risk of harm, and
b. *Don Davis* failed to adequately warn *Paul Payne* of the danger or make that condition reasonably safe, and
c. *Don Davis's* conduct was more than momentary thoughtlessness, inadvertence, or error of judgment. In other words, *Don Davis* must have either known or been substantially certain that the result or a similar result would occur, or *he* must have displayed such an entire want of care as to establish that the act or omission was

ordinary prudence would not have done under the same or similar circumstances.

Palais Royal does not demonstrate why the general definition of negligence in the submitted charge was not sufficient. Instead, Palais Royal cites to *Barham v. Turner Construction Co.*, in which the Dallas Court of Appeals upheld the following specific definition:

"Negligence," with respect to [general contractor] means the failure to use ordinary care in the exercise of its control, if any, over the details of the work performed by [subcontractor].

*Barham,* 803 S.W.2d 731, 734 (Tex.App.— Dallas 1990, writ denied). The Dallas Court of Appeals held that the specific definition was proper because it placed before the jury the issue of the general contractor's control, if any, over the subcontractor's work. *Id.* at 737. By omitting the words "if any," which were included in the *Barham* instruction, Palais Royal's requested definition presumes that Lott exercised control over the worksite, leaving nothing for the jury to decide. *Barham,* thus, does not support Palais Royal's position.

We overrule point of error G.2.

### Sufficiency of the Evidence

In points of error C.1, and C.2, Palais Royal contends the evidence is both legally and factually insufficient to support Mr. Gunnels's status as an invitee. We need not reach these points. Because the judgment is supportable on the theory that Mr. Gunnels was a licensee injured by a premises defect, any deficiency in the evidence concerning his status as an invitee does not affect the judgment.

the result of actual conscious indifference to the rights, safety, or welfare of the persons affected by it.
Answer "Yes" or "No."

**6.** Palais Royal does not argue that Mr. Gunnels waived his claim for exemplary damages by not submitting this alternate theory to the jury. Palais Royal's point is that the charge requires Mr. Gunnels to prove his and Palais Royal's knowledge about the ladder even though he is claiming Palais Royal was grossly negligent.

In point of error C.4, Palais Royal contends the evidence is both legally and factually insufficient to support a finding that Palais Royal's conduct was willful, wanton, or grossly negligent. We do not reach this point for the reasons discussed above under point of error B.1.

■ Based on a premises-defect *licensee* theory, rather than a premises-defect *invitee* theory, Palais Royal in point of error C.3 attacks both the legal and factual sufficiency of the evidence that (1) Palais Royal had actual knowledge about the dangerous ladder and (2) Mr. Gunnels had no actual knowledge about the dangerous ladder. In deciding a legal sufficiency point, we must consider only the evidence and inferences tending to support the finding of fact and disregard all inferences to the contrary. *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 593 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). When we review a factual sufficiency point, we must weigh all the evidence and should set aside the jury's verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (Tex.1951). When both legal and factual sufficiency points are raised, we must first examine the legal sufficiency point. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981).

■ The Gunnels had to prove the following to recover under a premises-defect licensee theory: (1) the ladder created an unreasonable risk of harm to Mr. Gunnels; (2) Palais Royal knew about the dangerous ladder; (3) Mr. Gunnels did not know about the dangerous ladder; (4) Palais Royal failed to exercise ordinary care to protect Mr. Gunnels from danger; and (5) Palais Royal's failure was a proximate cause of injury to Mr. Gunnels. We conclude the evidence is legally sufficient.

Mr. Gunnels did not testify at trial, perhaps because of his severe head injury, resulting in lost mental capacity. Thus, we must look to circumstantial evidence to establish whether he had actual knowledge about the dangerous ladder. We consider only the evidence and inferences tending to support the jury's verdict. *Alm*, 717 S.W.2d at 593. The record demonstrates that Mr. Gunnels was injured the first and only time he climbed the ladder. There was one light to illuminate the upper mezzanine area, which was burnt out on the date of the accident, and Mr. Gunnels did not have a flashlight. Larry Sowell, a foreman for Empire Steel, climbed the ladder before Mr. Gunnels. Sowell testified he did not know Mr. Gunnels was following him up the ladder, therefore, he did not warn him. Sowell also testified he had no knowledge that Lott, the general contractor, did "anything with respect to warning people about the ladder or to correct the awkwardness of the ladder." There was no evidence that anybody warned Mr. Gunnels. Neither Sowell nor Mike Gerica, an Empire Steel employee who was also working in the upper mezzanine area, heard Mr. Gunnels say anything before he fell. Evidence showed that Mr. Gunnels was an experienced ironworker. The jury could have inferred that such a person would not knowingly encounter so dangerous a condition in the dark, for the first time, without discussing the danger or taking steps to reduce it. This circumstantial evidence constitutes some evidence that Mr. Gunnels had no actual knowledge the ladder was dangerous.

Regarding Palais Royal's knowledge about the ladder, Palais Royal, acting through Dean Stocker, was responsible for altering the design of the stockroom and ladder. *See Payne*, 838 S.W.2d at 237 (fact that State built culvert demonstrated State's knowledge of dangerous condition). In order to save money, Palais Royal acted as a construction architect and supervisor, and it did not resubmit the altered plans to the City to be repermitted. Palais Royal actually knew that the ladder was shortened and that visibility at the top of the ladder was obscured by the "drop" ceiling which Palais Royal insisted on lowering. These facts, albeit circumstantial, constitute some evidence that Palais Royal knew the ladder was dangerous.

■ We also conclude the evidence was factually sufficient. In looking at all the evidence, Palais Royal points out that Mr. Gunnels did not testify as to his knowledge

about the ladder. Given his severe head injuries, we are not persuaded this is probative. Palais Royal also points out that no one saw Mr. Gunnels fall, heard him cry out, or saw the expression on his face before he fell. This implies that Mr. Gunnels must prove his claim with direct evidence. A person's mental state, however, may be proved by direct or circumstantial evidence. *See Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex.1994) (mental state may be proved by circumstantial evidence). Regarding its knowledge about the ladder, Palais Royal points to the fact that Mr. Gunnels was the first person injured as a result of climbing the ladder and that Mark White, the store manager for Palais Royal, conducted monthly inspections of the ladder and did not report it to be unsafe. We conclude that the jury's verdict against Palais Royal under these facts was not so against the great weight and preponderance of the evidence so as to be manifestly wrong and unjust.

We overrule point of error C.3.

██ In point of error C.5, Palais Royal contends the evidence is both legally and factually insufficient to show it controlled the work or the worksite. Palais Royal, therefore, argues it owed no duty to Mr. Gunnels, citing cases concerning a land owner's duty to protect people from the criminal acts of third parties, *Butcher v. Scott*, 906 S.W.2d 14, 15 (Tex.1995); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995); *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex.1993), and cases concerning a land owner's lack of duty to supervise the work of independent contractors, *Exxon Corp. v. Quinn*, 726 S.W.2d 17, 19 (Tex.1987); *Hammack v. Conoco, Inc.*, 902 S.W.2d 127, 130 (Tex.App.—Houston [1st Dist.] 1995, writ denied). A land owner may also be liable, however, for negligence arising from a premises defect, regardless of the control it exercised. *Quinn*, 726 S.W.2d at 20; *Hammack*, 902 S.W.2d at 130. Because we ultimately uphold the judgment on that theory, any deficiency in the evidence showing control does not affect the judgment.

We overrule point of error C.5.

██ In point of error C.6, Palais Royal argues the evidence is both legally and factu-

ally insufficient to demonstrate proximate cause because there is no direct evidence of Mr. Gunnels's conduct, citing our opinion in *Summers v. Fort Crockett Hotel*, 902 S.W.2d 20, 25–26 (Tex.App.—Houston [1st Dist.] 1995, writ denied). We disagree.

In *Summers*, the plaintiff fell from an eighth-floor balcony after he had been drinking and possibly using the hotel's hot tub. No one witnessed the fall. The plaintiff's mother sued as his guardian and argued that (1) because her son did not jump and was not pushed, he must have fallen, and (2) because he fell, it must have been the result of a defective railing on the balcony and the lack of an adequate warning sign on the hot tub. *Id.* at 26. We concluded that because it was equally plausible that the plaintiff fell for some other reason, there was no evidence, either direct or circumstantial, that the plaintiff fell because the railing was defective. *Id.* at 26.

Michael S. Adams, an architect who was retained by Palais Royal as a construction expert, testified by deposition as follows:

Q ... What I want to find out is whether any failure of this ladder to comply with ANSI [American National Standards Institute] was a direct cause of Mr. Gunnels' falling.

A Yes.

Q All right. What is your opinion on that?

A My opinion is that the ladder, for all the reasons that you have summarized from my report, was so far out of compliance with acceptable standards for its design and construction that it was inherently hazardous as a means of access to the mechanical mezzanine.

We hold that this evidence alone is both factually and legally sufficient to establish causation.

We overrule point of error C.6.

██ In points of error C.7, C.8, and C.9, Palais Royal contends the evidence establishes as a matter of law that Sharpstown, Lott, Mr. Gunnels, Levy, and Loop were at least 50 percent contributorily negligent. Alternately, Palais Royal argues that the jury's

verdict that it is 100 percent negligent is against the great weight and preponderance of the evidence. Palais Royal makes the following specific allegations:

Sharpstown: It owned the premises, exercised the right to assume possession over the premises during the 1992 renovation, and hired Lott.

Lott: It was the general contractor for the 1992 renovation, had control over the worksite, and had the authority to enforce compliance with safety requirements.

Mr. Gunnels: He was the safety manager for Empire Steel and was responsible for conducting a hazard assessment on the job.

Levy: It was negligent in "sealing" two sets of architectural plans.

Loop: It installed the ladder despite a professional architect's plans to the contrary.

Palais Royal, however, filed sworn answers to numerous interrogatories that at times denied any party other than Mr. Gunnels was at fault. These interrogatories and Palais Royal's answers were read to the jury:

[I]n Answers to Interrogatories propounded to Specialty Retailers [7] on June 10th, 1993, Specialty Retailers answered the following question, Interrogatory 4: "If you claim any other party is at fault in the incident made the basis of this suit, what facts do you have to support this claim?"

Answer: "None at this time."

In amended Answers filed on July 7th, 1993, same question. Supplemental answers: "If you claim any other party is at fault in the incident made the basis of this suit, what facts do you have to support this claim?"

Answer: "None at this time."

In response to Interrogatory No. 3, sworn Answers filed October 18th, 1994, propounded to Palais Royal, Inc., Interrogatory No. 3: "Please state the full name, business and residential addresses and telephone number of any person or entity not presently a party that is or may be liable for all or part of the claims asserted in the pending action or is otherwise a potential party to this action."

Answer: "Defendant knows of no such parties."

Question 4: "If you claim any other party is at fault in the incident made the basis of this suit, what facts do you have to support this claim?" No answer.

In Answers amended and filed on November 1st of 1994, answer to Interrogatory No. 3: "Please state the full name, business and residential addresses and telephone numbers of any person or entity not presently a party that is or may be liable for all or part of the claims asserted in the pending action or is otherwise a potential party."

"Defendant knows of no such parties."

Question 4: "If you claim any other party is at fault in the incident made the basis of this suit, what facts do you have to support this claim?" No answer.

In Answers filed December 5th, 1994, amended by Palais Royal, Inc.: "If you claim any other party is at fault in the incident made the basis of this suit, what facts do you have to support this claim?"

Answer: "Defendant would state as follows: No. 1: Mr. Frank Gunnels climbed the ladder before thoroughly inspecting it in premises. No. 2: Mr. Frank Gunnels climbed the ladder with no compelling reason to do so. No. 3: Mr. Frank Gunnels climbed the ladder while light bulb on mezzanine was burned out. No. 4: Mr. Frank Gunnels climbed ladder while light turned off in stock room and failed to turn light on in stock room. No. 5: Mr. Frank Gunnels failed to step over loose lumber. No. 6: Mr. Frank Gunnels should have been knowledgeable in safety requirements re ladders. No. 7: Mr. Frank Gunnels failed to identify that ladder was allegedly dangerous. No. 8: Frank Gunnels failed to use temporary ladders which were available to him. No. 9: Frank Gunnels failed to use alternative means available of access to the mezzanine. No. 10: Mr. Frank Gunnels was experienced as a steel worker in climbing and walking on beams and should have been knowledgeable about dangers climbing ladders under these cir-

---

7. Specialty Retailers, Inc. was the parent corpo- ration of Palais Royal, Inc.

cumstances. No. 11: Mr. Frank Gunnels didn't tell anyone that he was climbing the ladder. No. 12: Mr. Frank Gunnels failed to ask persons on the mezzanine about the conditions ahead of him. No. 13: Mr. Frank Gunnels failed to ask about the safety and/or awkwardness of the ladder. Additionally, defendant contends that the other defendants to this lawsuit were negligent as generally set forth in the report of Michael Adams and the two depositions of Mr. Michael Adams, that H.A. Lott violated OSHA [Occupational Safety and Health Administration] standards related to fixed ladders. H.A. Lott failed to follow their own safety program and safety practices, and that Sharpstown defendants were in control of the premises and that Lott had notice of the awkwardness of the ladder."

As to Mr. Gunnels, Michael Adams, the architect who was retained by Palais Royal as a construction expert, testified by deposition as follows: "[T]he ladder, for all the reasons that you have summarized from my report, was so far out of compliance with acceptable standards for its design and construction that it was inherently hazardous as a means of access to the mechanical mezzanine."

Applying the tests for legal and factual sufficiency cited above, we hold the jury's determination that Palais Royal was 100 percent negligent is both legally and factually sufficient.

We overrule points of error C.7, C.8, and C.9.

### Statute of Limitations

In points of error D.1, D.2, D.3, D.4, D.5, D.6, D.7, D.8, D.9, D.10, D.11, and H.1, Palais Royal contends the Gunnels's claims are barred by the two-year statute of limitations. *See* Tex. Civ. Prac. & Rem.Code Ann. § 16.003(a) (Vernon Supp.1998). The accident occurred on February 4, 1992, and the Gunnels filed suit on January 15, 1993, stating "Defendant, PALAIS ROYAL, is a subsidiary, affiliate, division or operating unit of Specialty RETAILERS, INC."

The Gunnels served interrogatories on July 7, 1993, which "Specialty RETAILERS, INC. D/B/A PALAIS ROYAL, Defendant" answered:

3. Please state the full name, business and residential addresses, and telephone number of any person or entity not presently a party that is or may be liable for all or part of the claims asserted in the pending action or is otherwise a potential party to this action.

*ANSWER:*

Loop Construction Co. . . .

Levy Assoc. Architects . . .

4. If you claim that any other party is at fault in the incident made the basis of this suit, what facts do you have to support this claim?

*ANSWER:*

None at this time.

. . . .

12. Please describe in detail any and all prior injuries or claims involving Specialty Retailers, Inc., d/b/a/ Palais Royal, associated with the ladder involved in the accident made the basis of this suit.

*ANSWER:*

None to our knowledge.

. . . .

18. Has Specialty Retailers, Inc. been properly named in this lawsuit? If not, please state the correct name, including any d/b/a's, parent corporations, and other identifying information relating to ownership of the Palais Royal store where the incident made the basis of this suit occurred.

*ANSWER:*

Yes, Specialty Retailers, Inc. is the parent company of Palais Royal and all Palais Royal stock is 100% owned by Specialty Retailers, Inc.

19. How many stores does Specialty Retailers, Inc. (or if incorrectly named, the proper owner of Palais Royal) operate? For each such store, please give the name, address and telephone number of the store.

*ANSWER:*

848

Specialty Retailers, Inc. operates thirty-five stores as of June 1, 1993. See attached documents marked Exhibit E.

20. Please state the policy number and liability limits of the insurance policy in effect for the premises at Palais Royal where the incident made the basis of this lawsuit occurred.

*ANSWER:*

Primary: The Hartford ...

Excess: New England Insurance Co.... International Insurance Co....

21. Do any indemnification agreements exist with any other entities or parties to this suit? If so, please state the name of party, the date the agreement was made, and describe the agreement in detail.

*ANSWER:*

Yes, see the letter agreement of 1/15/92 between Palais Royal, Inc. and AMP Associates of Sharpstown attached as Exhibit D.

The limitations period ran on February 4, 1994.

On July 8, 1994, "SPECIALTY RETAILERS, INC. D/B/A PALAIS ROYAL ("Palais Royal"), Defendant" filed an amended answer to interrogatory 18:

*INTERROGATORY 18:*

Has Specialty Retailers, Inc. been properly named in this lawsuit? If not, please state the correct name, including any d/b/a's, parent corporations, and other identifying information relating to ownership of the Palais Royal store where the incident made the basis of this suit occurred.

*ANSWER:*

No. Specialty Retailers, Inc. presently owns 100% of the stock of Palais Royal, Inc. Palais Royal, Inc. is not a d/b/a of Specialty Retailers, Inc. Palais Royal, Inc. is a corporation duly authorized to conduct business in the State of Texas. Palais Royal, Inc. was the lessee of the premises in question on the date of the accident. Palais Royal, Inc. is the successor to Palais Royal of Houston, Inc. which was the lessee of the premises in question on the date the ladder was installed.

That same day, the Gunnels filed an amended petition naming "Defendant, PALAIS ROYAL, INC." On August 5, 1994, Palais Royal, Inc. answered and pleaded the affirmative defense of limitations.

At trial, the Gunnels orally requested a directed verdict on the limitations issue. The trial court's order granted the following:

BE IT REMEMBERED that on December 15, 1994, the Plaintiffs presented their Motion for Directed Verdict on Defendant Palais Royal, Inc.'s affirmative defense of limitations after all parties had rested, and the Court, after considering the argument of counsel, the pleadings on file and the evidence presented, being of the opinion that said Motion is well-taken and should be granted, enters its Order and findings as follows:

1. No dispute exists with regard to the following facts:

a. Suit was filed against Defendant Palais Royal, Inc.'s parent corporation, Defendant Specialty Retailers, Inc. d/b/a Palais Royal on January 15, 1993, within the two year limitations period;

b. On July 7, 1993, Defendant Specialty Retailers, Inc. d/b/a Palais Royal filed verified answers to Plaintiffs' interrogatories which confirmed that said Defendant had been sued in the proper capacity and that it was the operator of the Palais Royal store in the Sharpstown Mall, the site of the accident made the basis of this suit;

c. On July 8, 1994, which was after limitations had run, Defendant Specialty Retailers, Inc. d/b/a Palais Royal filed a verified amendment to its answers to Plaintiffs' interrogatories which, for the first time, notified Plaintiffs that Defendant Specialty Retailers, Inc. d/b/a Palais Royal had not been sued in its proper capacity and that its wholly owned subsidiary, Palais Royal, Inc. was the proper party;

d. Plaintiffs filed Plaintiffs' Third Amended Original Petition joining Palais Royal, Inc. on July 8, 1994, the same day that Defendant Specialty Retailers, Inc.

d/b/a Palais Royal filed its verified amended answers to interrogatories;

e. Defendant Palais Royal, Inc. and Defendant Specialty Retailers, Inc. d/b/a Palais Royal have been represented by the same attorneys of record throughout the pendency of this litigation;

2. The Court finds that:

a. Defendant Palais Royal, Inc. has presented no evidence or legally insufficient evidence that it was materially prejudiced by its joinder on July 8, 1994;

b. Defendant Palais Royal, Inc. was provided with fair notice of the pendency of this litigation upon the filing and service of Plaintiffs' Original Petition against Defendant Specialty Retailers, Inc. d/b/a Palais Royal;

c. Defendant Palais Royal, Inc., as a result of the filing of Plaintiffs' Original Petition on January 15, 1993 against Defendant Specialty Retailers, Inc. d/b/a Palais Royal, was put on notice of Plaintiffs' claims against it and was not misled, prejudiced, or placed at a disadvantage in obtaining relevant evidence to defend the claims;

d. Defendant Specialty Retailers, Inc.'s responses to Plaintiffs' interrogatories filed on July 7, 1993 acted so as to mislead Plaintiffs into believing that Plaintiffs had sued all proper and necessary parties, parents or subsidiaries of Defendant Specialty Retailers, Inc. as the owner and/or operator of the Sharpstown Center Palais Royal store.

3. It is, therefore, ORDERED, ADJUDGED AND DECREED:

a. Plaintiffs' Motion for Directed Verdict on Defendant Palais Royal, Inc.'s affirmative defense that Plaintiffs' claims against Palais Royal, Inc. were barred in total by the applicable statute of limitations is herewith granted;

b. Limitations were tolled with respect to Defendant Palais Royal, Inc. by the filing of Plaintiffs' Original Petition on January 15, 1993, and the subsequent timely service of citation on Defendant Specialty Retailers, Inc. d/b/a Palais Royal.

SIGNED this *6th* day of *February,* 1995.

Estoppel may bar a limitations defense when a party, or its agent or representative, makes representations that induce plaintiffs to delay filing suit within the applicable limitations period. *Villages of Greenbriar v. Torres,* 874 S.W.2d 259, 264 (Tex.App.—Houston [1st Dist.] 1994, writ denied); *Cook v. Smith,* 673 S.W.2d 232, 235 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). However, the failure to file suit must be unmixed with want of diligence on the plaintiffs's part. *Torres,* 874 S.W.2d at 264; *Leonard v. Eskew,* 731 S.W.2d 124, 129 (Tex. App.—Austin 1987, writ ref'd n.r.e.). Plaintiffs may not continue to rely on the defendant's original inducement beyond a point when it becomes unreasonable to do so. *Leonard,* 731 S.W.2d at 129.

To invoke estoppel, a party must prove that (1) a false representation or concealment of material facts, (2) made with knowledge, actual or constructive, of those facts (3) with the intention that it should be acted on, (4) to parties without knowledge or means of obtaining knowledge of the facts, (5) who detrimentally rely on the representation or concealment. *Johnson & Higgins, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 515–16 (Tex.1998); *Cook,* 673 S.W.2d at 235; *Torres,* 874 S.W.2d at 264. The effect of such estoppel is not to "toll" or suspend the running of the statute of limitations; rather, the effect is simply to preclude the defendant from interposing limitations when it has induced the plaintiffs not to file suit, within the limitations period, on a cause of action the plaintiffs know they have. *Leonard,* 731 S.W.2d at 129.

In reviewing a case in which a verdict has been directed, we must view the evidence in the light most favorable to the party against whom the verdict was rendered and disregard all contrary evidence and inferences. *Qantel Bus. Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 303 (Tex.1988). If we conclude there is any evidence of probative value which raises a material fact issue, then we must reverse the judgment and remand the case to allow the jury to determine the issue. *Id.; Harris County v. Wals-*

*weer*, 930 S.W.2d 659, 664 (Tex.App.—Houston [1st Dist.] 1996, writ denied).

■ In its appellate brief, Palais Royal focuses on two issues: (1) the estoppel effect of Specialty Retailers, Inc. d/b/a Palais Royal's answer to interrogatory number 18, "Has Specialty Retailers, Inc. been properly named in this lawsuit?" and (2) the theory of misidentification. The trial court's directed verdict, however, was not necessarily based on either of these issues. The trial court could have granted the directed verdict because of the estoppel effect of Specialty Retailers's answer to interrogatory number 19, "How many stores does Specialty Retailers, Inc. (or if incorrectly named, the proper owner of Palais Royal) operate?": "Specialty Retailers, Inc. operates thirty-five stores as of June 1, 1993. See attached documents marked Exhibit E." There is no "Exhibit E" in the appellate record. We must presume that the Sharpstown store was listed there. *See Christiansen v. Prezelski*, 782 S.W.2d 842, 843 (Tex.1990) (presumption that omitted portions of appellate record support judgment). The trial court could have reasonably concluded that this answer, which was never amended, misled the Gunnels into believing they had sued all the owners and operators of the Sharpstown Center Palais Royal store. Moreover, Palais Royal has not directed us to any evidence that raises a material fact issue concerning Specialty Retailers, Inc. d/b/a Palais Royal's ownership or operation of the Sharpstown Center Palais Royal store.

We hold the trial court did not err in granting the directed verdict, and we overrule points of error D.1, D.2, D.3, D.4, D.5, D.6, D.7, D.8, D.9, D.10, D.11, and H.1.

## Prejudgment Interest

In point of error E.2, Palais Royal contends the trial court erred in using January 15, 1993, the date the Gunnels filed suit, for purposes of calculating prejudgment interest. Palais Royal argues that it was not sued until July 8, 1994, when the Gunnels filed their amended petition specifically naming Palais Royal, Inc. *See generally* Tex. Fin.Code Ann. § 304.104 (Vernon 1998) (prejudgment interest accrues during period beginning 180th day after suit filed and ending on date preceding date judgment rendered). We hold that Palais Royal is estopped to deny it had proper notice for the reasons set forth above regarding points of error D.1, D.2, D.3, D.4, D.5, D.6, D.7, D.8, D.9, D.10, D.11, and H.1.

We overrule point of error E.2.

## Gross Negligence

■ In point of error G.3, Palais Royal argues the trial court erred in refusing its proposed instruction on gross negligence:

You are instructed that:

A. "Gross negligence" means:

1) That viewed objectively from the standpoint of Palais Royal, Inc. at the time of the occurrence and without viewing the matter from hindsight, Palais Royal, Inc.'s act or omission involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Frank Gunnels, Sr. and

2) That Palais Royal, Inc. had actual, subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of Frank Gunnels, Sr.

B. "Conscious indifference" means that Palais Royal, Inc. proceeded with actual, subjective awareness that harm to Frank Gunnels, Sr., was a highly probable consequence. Such knowing indifference to the rights, safety, and welfare of Frank Gunnels, Sr., is the mental state that distinguishes "gross negligence" from ordinary "negligence."

Instead, the judge gave the following definition:

"Gross negligence" means more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to establish that the act or omission in question was the result of actual conscious indifference to the rights, welfare, or safety of the persons affected by it.

This definition is substantially the same as the then-current statutory definition of gross

negligence. *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, sec. 2.12, § 41.001(5), 1987 Tex. Gen. Laws 37, 44 (former TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(5), since amended) (" 'Gross negligence' means more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected."). Palais Royal cites no authority suggesting that submitting a statutory definition of gross negligence constitutes error, and we are aware of none.

We overrule point of error G.3.

### Exemplary Damages

In point of error C.10, Palais Royal contends the evidence is legally and factually insufficient to support exemplary damages.

■■■ Gross negligence involves two components: (1) the defendant's act or omission and (2) the defendant's mental state. *Moriel,* 879 S.W.2d at 21.[8] As defined in 1987, the act or omission element must involve behavior that endangers the rights, safety, or welfare of the person affected. Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, sec. 2.12, § 41.001(5), 1987 Tex. Gen. Laws 37, 44 (former TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(5), since amended). Gross negligence differs from ordinary negligence with respect to both elements—the defendant must be "consciously indifferent" and its conduct must "create an extreme degree of risk." *Moriel,* 879 S.W.2d at 21.

■■■ The test for gross negligence contains both an objective and a subjective component. *Id.* at 21–22. Subjectively, the defendant must have actual awareness of the extreme risk created by its conduct. *Id.* at 22. Objectively, the defendant's conduct must involve an "extreme degree of risk," a threshold significantly higher than the objective "reasonable person" test for negligence. *Id.* at 22. Extreme risk is a function of both the magnitude and the probability of the anticipated injury to the plaintiff. *Id.* at 22. The "extreme risk" prong is not satisfied by

a remote possibility of injury or even a high probability of minor harm, but rather "the likelihood of serious injury" to the plaintiff. *Id.* at 22. An act or omission that is merely thoughtless, careless, or not inordinately risky cannot be grossly negligent. *Id.* at 22. Only if the defendant's act or omission is unjustifiable and likely to cause serious harm can it be grossly negligent. *Id.* at 22.

■■■ In reviewing the evidence under a no evidence point, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. Cat Contracting, Inc.,* 964 S.W.2d 276, 285 (Tex.1998); *see also Moriel,* 879 S.W.2d at 24 ("The evidence presented, viewed in the light most favorable to the prevailing party, must be such as to permit the logical inference [that the jury must reach]."). In evaluating legal sufficiency, we are required to determine whether the proffered evidence as a whole rises to the level that would enable reasonable and fair-minded people to differ in their conclusions. *Moriel,* 879 S.W.2d at 25.

■■■ Michael Adams, Palais Royal's retained construction expert, testified by deposition as follows:

Q [I]f you alter or vary the [building] plans without a change order and appropriate documentation prepared by an architect and sealed by an architect, does that violate the building permit that you've received?

A Not necessarily, no.

Q In what cases would it violate the permit that you have received?

. . . .

A Certainly if there are changes that affect matters of structure or life safety, those would represent changes that should be accounted for by a change order and, if appropriate, repermitted by the city.

. . . .

Q ... Do you have any evidence from anything you have read to indicate that

---

8. *Moriel* was decided on June 8, 1994, before the trial of this case.

Palais Royal reported the changes they were making to the stockroom to the City of Houston permitting department?

A  Which changes do you mean?

Q  Changing of the ladder location, height, wall height, and opening to the mezzanine level.

A  No.

Q  Do you have any evidence to indicate that Palais Royal ever notified Levy Associates Architect that it was making changes to the ladder, the ladder height, wall height or opening to the mezzanine?

A  No.

. . . .

Q  Have you been out there to look at the location, sir?

A  Yes.

Q  Did you climb up the ladder?

A  Only far enough to be able to put my head up to see where the mezzanine level was.

Q  And you saw where the mezzanine level was?

A  Yes.

. . . .

Q  Is the condition, in your opinion, of that mezzanine level as it exists when you saw it one that violates OSHA requirements for some type of railing around an opening?

A  Yes.

Q  So, the changes that were made, whether by Palais Royal or Loop, were changes that affected life safety?

A  Yes.

. . . .

Q  When you saw the condition of the stockroom as it existed in March or April of '94, did you come to the conclusion that what existed out there was a violation of certain OSHA requirements?

A  Are you talking about the ladder, specifically?

Q  The ladder and the absence of the railing.

A  Yes.

. . . .

Q  ... You believe that the ladder, as constructed out there, does not comply with ANSI standards. Is that correct?

A  Correct.

. . . .

Q  ... What I want to find out is whether any failure of this ladder to comply with ANSI was a direct cause of Mr. Gunnels' falling.

A  Yes.

Q  All right. What is your opinion on that?

A  My opinion is that the ladder, for all the reasons that you have summarized from my report, was so far out of compliance with acceptable standards for its design and construction that it was inherently hazardous as a means of access to the mechanical mezzanine.

. . . .

Q  ... Can you point us to the particular problem with the ladder that you believe was the cause of Mr. Gunnels' fall?

Q  Probably the best summary of that would be the fact that it was being used.

. . . .

Q  ... If Palais Royal, in fact, does have people in their organization whose job it is to go from store to store and to review items for safety and compliance with OSHA so that Palais Royal's employees can work in a safe environment, is the existence of the ladder as you saw it the day you saw it the type of thing a knowledgeable safety person would see as being an unsafe condition?

A Yes.

. . . .

Q  ... I take it when you read Mr. Wyatt's deposition, you learned that Palais Royal was the entity responsible for the ladder as it is today and it was at the time that Frank Gunnels fell from it. Correct?

A That may be a rough summary of Mr. Wyatt's testimony, yes.[9]

Q You learned from reading Mr. Wyatt's deposition that he was directed by Palais Royal to locate the ladder and to modify the ladder to the condition that it is today and was at the time of Mr. Gunnels' fall. Right?

A I think that's summarized in my report and that's generally what he said.

Q And he said, in fact, that that change was made to save some money. Do you remember that?

A I think that's what he said, yes.

Q And you, in your report, criticize Palais Royal for allowing this, which you have called, "inherently hazardous ladder to be in place from the time it was installed in 1984 until the time of Mr. Gunnels' accident." Correct?

A That was one of my conclusions, that that ladder which was hazardous remained there for that period of time. That's right.

. . . .

Q . . . And is it your opinion that Palais Royal was negligent in allowing that ladder to remain in place from 1984 up until February of '92?

A I believe that's true, yes.

Q If Palais Royal was responsible for directing that the ladder be relocated to where it is today, would you agree with me that they were negligent in doing so?

A Not necessarily.

Q Why not?

A The ladder could have been relocated and built safer.

Q Well, but it wasn't, was it?

A No, clearly not.

. . . .

Q . . . When you reviewed the ladder and climbed up it, I believe you found it to be "inherently dangerous"—I'm sorry, "inherently hazardous." Did I write that down right?

A Uh-huh.

. . . .

Q . . . What does "inherently hazardous" mean to you?

A It means it's got some fatal flaws.

Q Fatal flaws. Does that mean it poses a risk of danger to whoever is trying to use it?

A That's a fair representation of what I mean, yes.

Q Does that mean that if someone attempts to use it, that there is an extreme risk that they might fall and be injured?

A Might, yes.

Q And, of course, if they did fall, they might sustain the kind of injuries that Mr. Gunnels sustained?

A They might.

. . . .

Q . . . It's your testimony that this ladder posed an extreme danger or extreme hazard of risk of personal injury. Correct?

A Yes, it might.

This testimony is legally sufficient to satisfy the objective element by demonstrating there was an extreme degree of risk.

The Gunnels, however, did not introduce evidence at trial to satisfy the subjective element by showing Palais Royal had *actual awareness of the extreme degree of risk.* There was no testimony that Dean Stocker or the store manager was actually aware of any extreme degree of risk, that any of Palais Royal's safety inspectors noticed an extreme risk, or that any maintenance worker or contractor complained to Palais Royal about the ladder. The evidence would be legally sufficient if the test for gross negligence included an element that the actor knew *or should have known* about the extreme degree of risk. *Moriel,* however, requires subjective, actual awareness. 879 S.W.2d at 22.

Because the Gunnels did not introduce evidence of Palais Royal's actual awareness of the extreme degree of risk, they cannot re-

---

**9.** Sanford Wyatt was the president of Strange Loop Construction in 1984.

cover damages for gross negligence. We sustain point of error C.10.

### Attorney's Fees as Element of Exemplary Damages

In points of error E.1, F.2, and G.4, Palais Royal claims that the trial court erred in submitting a jury charge that listed "compensation for inconvenience and attorneys' fees" as a factor to consider in awarding exemplary damages. Palais Royal argues that allowing the jury to consider attorney's fees is prohibited by the supreme court's decision in *Moriel*, and, thus, it is entitled to a remittitur of the $1,440,000 in exemplary damages that the jury attributed to "inconvenience and attorneys' fees." *Moriel*, 879 S.W.2d 10.

Although we see nothing in *Moriel* that precludes consideration of attorney's fees in awarding exemplary damages, these points are moot in light of our disposition of point of error C.10 above. *See Hofer v. Lavender*, 679 S.W.2d 470, 474 (Tex.1984); *Cantu v. Butron*, 921 S.W.2d 344, 354 (Tex.App.—Corpus Christi 1996, writ denied) (both cases allowing consideration of inconvenience and attorney's fees in setting exemplary damages). Accordingly, we do not reach points of error E.1, F.2, and G.4.

### Jury Argument

In points of error I.1, I.2, and I.3, Palais Royal complains of alleged inflammatory and incurable jury argument. In point of error F.1, Palais Royal contends the trial court misinterpreted *Dresser Industries, Inc. v. Lee* to require the exclusion of evidence of Mr. Gunnels's negligence. *See Dresser*, 880 S.W.2d 750 (Tex.1993). Palais Royal did not brief these points in its initial brief, but requested leave to file a supplemental brief addressing these points. We denied Palais Royal's motion to file its supplemental brief.

■ Points of error unsupported by the citation of authority present nothing for review. *Harris County Mun. Util. Dist. No. 48 v. Mitchell*, 915 S.W.2d 859, 866 (Tex.App.—Houston [1st Dist.] 1995, writ denied). Accordingly, we overrule points of error I.1, I.2, I.3, and F.1.

### Judgment Credit

■ Palais Royal brings a conditional point of error in the event this Court affirms the trial court's judgment in any respect. Palais Royal claims it is entitled to a $702,-447.73 judgment credit based on a July 16, 1995 settlement between the Gunnels and Lott because Lott was a "settling person" for purposes of the proportionate responsibility statute. TEX. CIV. PRAC. & REM.CODE ANN. § 33.011(5) (Vernon 1997). Civil Practice and Remedies Code section 33.011(5) defines "settling person" as "a person who *at the time of submission* has paid or promised to pay money or anything of monetary value to a claimant." *Id.* (emphasis added).

We defined "at the time of submission" to mean a time before the charge conference, the reading of the charge to the jury, and closing arguments. *Knowlton v. United States Brass Corp.*, 864 S.W.2d 585, 598 (Tex. App.—Houston [1st Dist.] 1993), *aff'd in part and rev'd in part on other grounds*, 919 S.W.2d 644 (Tex.1996). The trial court in the instant case submitted the case to the jury on December 15, 1994, seven months before Lott settled. Accordingly, Lott cannot be a "settling person" for purposes of the proportionate responsibility statute.

We overrule the conditional point of error.

### Cumulative Error

Palais Royal brings a final point of error alleging cumulative error, but neither briefs this point nor cites any authority. We overrule this point.

### Conclusion

We reverse the judgment of the trial court as to exemplary damages and render judgment that the Gunnels take nothing on their claim for exemplary damages. In all other respects, we affirm the judgment of the trial court.

O'CONNOR and TAFT, JJ., concur in part and dissent in part.

O'CONNOR, Justice, concurring and dissenting.

I dissent from the panel's resolution of point of error C.10, and concur in the remainder of the judgment.

The majority sustained point of error C.10, holding there was no evidence of gross negligence. The majority's holding is premised on the notion that the plaintiff did not introduce evidence to satisfy the subjective component of the gross negligence test. I disagree.

The evidence in this case was that Palais Royal wanted to save money on the construction project, which it did by (1) contracting with Levy for minimal architectural plans (instead of detailed plans); (2) not retaining Levy, the design architect, to oversee construction; (3) appointing a window decorator with no construction training or experience to oversee the construction and re-design of plans; and (4) ignoring Levy's construction plans relating to safety.

Stocker, the window designer, had no training or experience with construction and design of a building. Stocker ignored Levy's construction plans, and redesigned the ceiling and used a shorter ladder. The 16–foot ladder in Levy's plans met the OSHA requirements. Stocker's ladder did not.

A corporation cannot appoint someone completely untrained and inexperienced to perform a job that takes training and experience, and then claim it was not grossly negligent when someone is hurt by that person's work. Appointing a decorator to oversee construction of a project that included serious safety matters was a prescription for disaster. Palais Royal's actions in this case was just the sort of negligence that rises to the level of gross negligence.

I concur in the rest of the panel's judgment.

TAFT, Justice, concurring and dissenting.

To uphold the jury's determination that Palais Royal was 100 percent liable, the majority opinion relies on Palais Royal's interrogatory answers that, at times, denied any party other than Frank Gunnels was at fault. While this may be sufficient to avoid a legal sufficiency challenge, a neutral view of all of the evidence compels the conclusion that the jury's verdict was against the great weight and preponderance of the evidence and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)(stating standard of review).

There is no denying that Palais Royal was responsible for the original construction, in 1984, of the ladder from which Gunnels fell. At the time of the fall in 1992, however, Gunnels was a subcontractor on a remodeling job. The general contractor, H.A. Lott, was in charge of safety on the job site where the ladder was located. The only person who ever expressed doubts about the ladder, prior to Gunnels's fall, was Larry Sowell, an employee of Gunnels. Sowell had told Todd Scott, assistant superintendent for H.A. Lott, that the ladder was "real awkward." H.A. Lott's superintendent, Carl Price, considered the ladder safe, however. So did all the Palais Royal employees who had used it for eight years without incident.

Palais Royal's expert, Michael Adams, testified that H.A. Lott was negligent for not identifying the ladder as a safety hazard. As set out in the majority opinion, Adams also testified the ladder was so far out of compliance with acceptable standards that it was inherently hazardous. Nevertheless, Price, who had the most authority over safety on the job site and to whom safety was a full-time job, had personally climbed the ladder and thought it safe. Thus, he never considered posting warnings of any hazard.

Under these circumstances, the jury's verdict that Palais Royal was 100 percent liable for the injuries suffered by Frank Gunnels is so against the great weight and preponderance of the evidence as to be manifestly unjust. Accordingly, I would sustain Palais Royal's point of error C.8. Therefore, I concur in the reversal as to exemplary damages, but dissent from the affirmance of the trial

court's judgment in all other respects.[1]

---

1. I join in all portions of the majority opinion except for the discussion of point of error C.8.